# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| CRAFTLINE GRAPHICS, INC., and <br> KAPPA GRAPHICS, L.P., <br><br> Plaintiffs, <br><br> v. <br><br> TOTAL PRESS SALES & SERVICE, LLC, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Cause No. 1:17-CV-462-HAB <br> ) <br> ) <br> ) <br> ) |

## OPINION AND ORDER

This matter comes before the Court on Plaintiffs' Second Verified Motion for Default Judgment (ECF No. 25) and Plaintiffs' Request for Ruling on Second Motion for Default Judgment (ECF No. 27).

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint for Damages and Jury Demand (ECF No. 1) on November 6, 2017. Despite basing this Court's jurisdiction on 28 U.S.C. § 1332 (*Id.*, p. 2, ¶4), Plaintiffs failed to properly allege their own citizenship as well as that of Defendant. As a result, this Court entered an Opinion and Order (ECF No. 4) on November 8, 2017, directing Plaintiffs to "supplement the record by filing an amended complaint that properly alleges the citizenship of each of the parties on or before November 22, 2017." (*Id.*, p. 2). Plaintiffs filed their Motion to Amend Complaint (ECF No. 5), which included a proposed complaint that properly identified the citizenship of the parties, on November 9, 2017, and that motion was granted on November 13, 2017 (ECF No. 6).

On January 9, 2018, Plaintiffs filed their Verified Motion for Entry of Default Judgment (ECF No. 11), an Affidavit of Debt signed by Plaintiffs counsel, Kevin P. Podlaski ("Podlaski") (ECF No. 12), an Affidavit of Attorney Fees, Costs and Expenses, also signed by Podlaski (ECF

No. 13), and a proposed order entering judgment in favor of Plaintiffs in the amount of $1,195,226.50 (ECF No. 14). These filings put the judgment cart before the entry horse; Fed. R. Civ. P. 55(a) requires an entry of default by the clerk before a default judgment can be sought. Accordingly, on January 19, 2018, Plaintiffs filed their Request for Entry of Default (ECF No. 15), and a default was entered against Defendant on January 22, 2018 (ECF No. 16).

Entry in hand, Plaintiffs filed a one paragraph Motion for Default Judgment (ECF No. 17) on January 24, 2018. The motion contained no evidence or argument, but merely asked this Court to enter judgment in favor of the Plaintiffs in the amount of $1,195,226.50. This Court entered its Opinion and Order on the motion (ECF No. 18) on April 17, 2018. In its Opinion and Order, this Court identified several deficiencies in the Plaintiffs' request for a seven-figure judgment, including:

- Plaintiffs provided no documentation in support of their request for attorney fees;
- Plaintiffs made no attempt to demonstrate the reasonableness of their request for attorney fees; and
- Plaintiffs provided no explanation as to why they were entitled to pre-judgment interest, or how the pre-judgment interest rate was calculated.

Plaintiffs were granted until May 17, 2018, to provide additional documentation and citation in support of their Motion for Default Judgment and Motion for Attorney Fees, Costs and Expenses. (*Id.*, p. 5).

On May 17, 2018, Plaintiffs filed their Response to the Court (ECF No. 19). In response to the Court's concerns regarding their claim for pre-judgment interest, Plaintiffs relied on the Indiana Tort Prejudgment Interest Statute ("TPIS"), Ind. Code § 34-51-4-1 *et seq*. As the name would suggest, the TPIS provides for prejudgment interest in "any civil action arising out of

tortious conduct" where certain statutory requirements are fulfilled.[1] I.C. § 34-51-4-1. In response to the Court's concerns regarding the request for attorney fees, Plaintiffs provided an Amended Affidavit of Attorney Fees, Costs and Expenses (ECF No. 21), which included a redacted Matter Ledger Report purporting to show time entries totaling $12,744.00 in attorney fees allocated to a claim that did not proceed to a responsive pleading. Plaintiffs also filed an Amended Affidavit for Entry of Default Judgment (ECF No. 20), again signed by Podlaski, which now sought judgment in favor of the Plaintiffs in the amount of $1,039,966.40.

On September 19, 2018, this Court entered its Opinion and Order on Plaintiffs' Motion for Default (ECF No. 17) and related filings (ECF Nos. 19–21). While this was the Plaintiffs' second attempt to provide the evidence necessary to support the requested judgment, the Court was again forced to point out multiple deficiencies in Plaintiffs' filings, including:

- Plaintiffs' Affidavit of Debt was signed by Podlaski rather than an individual with personal knowledge of the damages;
- Plaintiffs failed to explain their theory of damages, particularly where contractual damages were claimed against the Defendant arising from a contract to which the Defendant was not a party;
- Plaintiffs sought relief under the TPIS in a case of purely economic damages, which sounded in contract instead of tort;
- Plaintiffs relied on Indiana law where the contract between Plaintiff Kappa Graphics, L.P. ("Kappa") and Defendant contained a choice of law provision identifying Pennsylvania law as governing the contract; and
- Plaintiffs continued to fail to demonstrate their right to attorney fees or the reasonableness of their claimed fees.

---

[1] One of those statutory requirements is a timely offer to settle by plaintiffs. *See* I.C. § 34-51-4-6. This requirement is very specific, and requires a party seeking prejudgment interest to demonstrate: (1) an offer made within one year of the filing of the claim; (2) the offer must provide for payment of the settlement offer within sixty days after the offer is accepted; and (3) the offer must not exceed one and one-third of the amount of the judgment awarded. *Id*. Plaintiffs claimed that they issued a demand letter that complied with these requirements, but a copy of the letter was not provided to the Court. Accordingly, the Court would have had no way to determine whether the TPIS would have applied in this case. The foregoing notwithstanding, since this matter is governed by Pennsylvania law, Plaintiffs' compliance or lack thereof with the terms of the TPIS is not determinative of their right to recover.

Plaintiffs' Motion for Default and request for attorney's fees were denied without prejudice and with leave to refile.

On October 12, 2018, Plaintiffs filed their Second Verified Motion for Entry of Default (ECF No. 25),[2] their Response to the Court's September 19, 2018 Opinion and Order (ECF No. 24) (the "Response"), and yet another Affidavit of Debt (ECF No. 26), this time signed by the Vice President and General Counsel for Spartan Organization, Inc., "the management company for Craftline Graphics, Inc. and Kappa Graphics, L.P." (internal parentheticals omitted). Plaintiffs now seek judgment in the amount of $1,164,171.00. The Court will address these most recent filings below.

## COMPLAINT ALLEGATIONS

Plaintiffs' allegations, as taken from their First Amended Complaint, are as follows. On July 31, 2015, Kappa and Defendant entered into a service agreement (the "Contract") under which Defendant was to dismantle a printing press owned by Kappa (the "Press") and located at Kappa's facility in Pittston, Pennsylvania, and then clean, refurbish, load, transport, rig, and reassemble the Press at Plaintiff Craftline Graphics, Inc.'s ("Craftline") facility in Fort Wayne, Indiana. Defendant began disassembly of the Press on August 10, 2015, and began reassembly of the Press on December 7, 2015. On January 19, 2016, Kappa and Craftline entered into an Equipment Lease Agreement (the "Agreement"), whereby Kappa agreed to lease the Press at a rate of $16,435.00 per month for a total of sixty months. Assuming Craftline made all payments required under the Agreement, Craftline would pay Kappa a total of $986,100.00.

In "Late January, 2016," Defendant encountered electrical problems when it attempted to operate the reassembled Press. Defendant asked Craftline to contact the Press' manufacturer,

---

[2] While the motion was entitled a Second Motion for Default, it was actually the Plaintiffs' fourth attempt to obtain a default judgment (See ECF Nos. 12, 17, 19 and 25).

4

ManRoland, for help getting the Press running. Defendant agreed to pay for ManRoland's charges. On February 1, 2016, ManRoland diagnosed the problems with the Press, concluding that Defendant improperly shutdown the Press in "perfect mode," and then compounded the problem by reassembling the Press in the same "perfect mode." This resulted in the destruction of the Press' main gearbox. ManRoland cleared the electrical errors and reprogrammed the software to allow Defendant to continue with its work. Over the subsequent three months, Defendant continued to try to reassemble the Press in working condition, but all attempts failed. Defendant ultimately gave up and abandoned its work on May 27, 2016.

As a result of the foregoing, Plaintiffs allege three legal theories: Count I – Breach of Contract; Count II – Breach of Warranty; and Count III – Negligence. In support of Count III, Plaintiffs alleged the following acts of negligence: Defendant stopped the Press and disassembled it in "perfect mode;" Defendant moved and reassembled the Press while still in "perfect mode;" Defendant failed to reassemble the Press within manufacturer tolerances; and Defendant ran the Press in a compromised and damaged condition, resulting in additional damage.

## LEGAL ANALYSIS

### A. CONTRACT VERSUS TORT DAMAGES

Plaintiffs spend the majority of the Response to the Court's September 19, 2018, Opinion and Order (ECF No. 24) reviewing Pennsylvania law on the issue of whether they are entitled to negligence damages. Relying on *Bruno v. Erie Ins. Co.*, 106 A.3d 48 (Pa. 2014), Plaintiffs assert that they can recover negligence damages in this case under the "gist of the action" doctrine. (ECF No. 24, pp. 2–5). While Plaintiffs' discussion of *Bruno* is largely correct, the conclusion they draw from the case is not. As noted in the Response, the key language from *Bruno* is as follows:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something

5

that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id*. at 68. Two years later, the Pennsylvania Supreme Court further delineated the scope of the "gist of the action" doctrine, stating:

> The gist of the action doctrine acts to foreclose tort claims: 1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; [or] 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim. The critical conceptual distinction between a breach of contract claim and a tort claim is that the former arises out of breaches of duties imposed by mutual consensus agreements between particular individuals, while the latter arises out of ***breaches of duties imposed by law as a matter of social policy***.

*B.G. Balmer & Co. v. Frank Crystal & Co., Inc.*, 148 A.3d 454, 469 (Pa. Super. Ct. 2016) (original emphasis) (citing *Reardon v. Allegheny Coll.*, 926 A.2d 447 (Pa. Super. Ct. 2007)).

When one applies the facts as alleged by Plaintiffs to the holding of *Bruno* and *B.G. Balmer*, it is clear that Pennsylvania courts would view Plaintiffs' claim as one for breach of contract. Plaintiffs' negligence claim arises solely from the contractual relationship between Kappa and Defendant, and the alleged duties breached were grounded in the Contract; Defendant had a duty to properly service the Press only by virtue of the Contract. In addition, the negligence claim is effectively identical to the breach of contract claim, as the allegations of negligence are little more than a rewording of the contractual breach allegations. (Compare ECF No. 7, ¶¶ 9–10). The Court finds that the "gist" of Plaintiffs' action is a breach of contract claim.

Perhaps more clearly, Plaintiffs' complaint does not involve a "broader social duty owed to all individuals." *See Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 885 ( Pa. 2007) (holding that action against insurer for bad faith conduct pursuant to 42 Pa. Cons. Stat. § 8371 is for breach of a duty

"imposed by law as a matter of social policy, rather than one imposed by mutual consensus"; thus, action is in tort); *see also* W. Page Keeton, *Prosser and Keeton on Torts* 656 (5th ed. 1984) (reviewing extant case law, and noting the division therein between actions in tort and contract based on the nature of the obligation involved, observing that "[t]ort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others ... [which are] independent of promises made and therefore apart from any manifested intention of parties to a contract, or other bargaining transaction."). There is no social duty, or compelling social policy, that requires one business to repair the printing press of another. Indeed, the Court can conceive of very few commercial transactions that would fall under the umbrella of a social duty; the servicing of large machinery is not one of them. Rather, the duties between Kappa and Defendant in this case flow entirely from the Contract. Accordingly, the "gist of the action" doctrine compels a finding that Plaintiffs cannot recover in tort.

As a fallback position, Plaintiffs assert that they can recover under their negligence theory because they "are entitled to economic damages pursuant to an exception regarding negligent misrepresentation in Pennsylvania's general economic loss rule." This exception flows from the Restatement (Second) of Torts § 552 which provides, in relevant part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

As Plaintiffs note, § 552 has limited application, applying in "cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of

7

information." *Gongloff Contracting, L.L.C. v. L. Robert Kimball & Assocs., Architects & Engineers, Inc.*, 119 A.3d 1070, 1076 (Pa. Super. Ct. 2015).

There are several problems with Plaintiffs' reliance on § 552. First, a claim under § 552 is an independent tort in Pennsylvania: negligent misrepresentation. *See Rempel v. Nationwide Life Ins. Co.,* 370 A.2d 366, 367 (Pa. 1977) ("The elements of the tort of negligent misrepresentations are stated in Section 552 of Restatement of Torts."). Plaintiffs do not assert such a claim in the Complaint. Rather, Plaintiffs describe Defendant's duties as "a duty to properly perform contracted-for work in a workmanlike manner" and "a duty not to damage the Press." (ECF No. 7, p. 9, ¶ 27). There is no indication anywhere in the Complaint that Plaintiffs are stating a claim under § 552 or are seeking to hold Defendant liable for negligent misrepresentation. Plaintiffs cannot simply create such an allegation now in an effort to save their negligence action. *See Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014) (noting that, in calculating damages for the purposes of default judgment, "the amount sought must naturally flow from the injuries pleaded.") (quotations omitted).

Furthermore, the "misrepresentations" identified by Plaintiffs do not fall under the ambit of the claimed exception. As noted by the Third Circuit, there is little occasion to apply § 552 where the plaintiff has a viable contract claim.

> The section's imposition of liability on those who "suppl[y] false information for the guidance of others in their business transactions," does not lend itself very easily to a contract situation. Indeed, virtually all the examples provided in the section involve liability to third parties. The reason is simple: where there is privity in contract between two parties, and where the policies behind tort law are not implicated, there is no need for an additional tort of negligent misrepresentation. Breach of contract, promissory estoppel, unjust enrichment, and other contract or quasi-contract remedies all protect parties who negotiate and reduce their agreement to writing.

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 620 (3rd Cir. 1995).

So it is here. The "misrepresentations" alleged by Plaintiffs are not examples of "false information for the guidance of others in their business transactions," but instead are simply provisions of the Contract that Plaintiffs allege were breached. (ECF No. 24, p. 7). If, as Plaintiffs suggest, every breached contractual provision constitutes "false information," then the exception created by § 552 would swallow the rule. As one commenter has noted:

> Allowing an exception for any party in privity, due merely to a negotiated contract, to seek redress through a claim of negligent misrepresentation has the potential to vitiate the economic loss rule. It is precisely for this reason that with increasing frequency, plaintiffs are presenting their negligence claims–or more accurately their contract claims–in the form of negligent misrepresentation in an attempt to circumvent the economic loss rule. An action for negligent misrepresentation when the parties are in privity is indistinguishable from an action for breach of contract: "If one is unable to meet his [contractual] obligation . . . has he not 'negligently misrepresented' his ability to do so?" If this is truly the intent of allowing an exception for "independent torts" it would be better "to drive that final coffin-nail" into the economic loss rule. Because the economic loss rule permits and encourages parties to allocate risk through contract negotiations, a tort action for negligent misrepresentation where the parties are in privity of contract affords no alternative relief other than to allow the parties to extricate themselves from a fairly negotiated bargain. Thus, for sophisticated commercial entities who deal with each other at arms length in contract negotiations, the economic loss rule should prevent recovery in negligent misrepresentation.

R. Joseph Barton, *Drowning in A Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L. Rev. 1789, 1840–41 (2000) (internal citations omitted). This Court will not be the one to drive the final nail into a coffin for a doctrine that is not dead. Plaintiffs cannot extricate themselves from the terms of the bargain Kappa negotiated, and the economic loss rule applies in this case to bar Plaintiffs' negligence claims for their purely economic losses.

9

**B.     DAMAGES AVAILABLE TO PLAINTIFFS**

Plaintiffs now request five categories of damages:[3] (1) parts and service costs paid by Craftline; (2) internal labor/material costs incurred by Craftline and "lost labor savings" due to delays; (3) estimated costs to have ManRoland repair the Press; (4) lost lease payments from Craftline to Kappa; and (5) prejudgment interest. The Court will now review Plaintiffs' monetary demands under each category in light of the evidence provided.[4]

Although upon default the factual allegations of a complaint relating to liability are taken as true, those allegations relating to the amount of damages suffered are ordinarily not. *See United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989). Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks. *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004). The plaintiff must provide evidence of damages. 10 *Moore's Federal Practice*, § 55.32[1][d] at p. 55–45 (3d ed. 2013) ("The claimant must establish the amount of damages . . ."). Where a party uses affidavits to support its claim for damages, the evidentiary material offered should consist of material within the personal knowledge of the affiant and not hearsay, and attached exhibits should be accompanied by sworn statements of the circumstances that would qualify them as full exhibits. *Oceanic Trading Corp. v. Vessel Diana*, 423 F.2d 1, 4 (2d Cir. 1970).

---

[3] The Plaintiffs' Second Motion for Default Judgment and Response to the September 19, 2018, Opinion and Order abandoned Plaintiffs' prior request for an award of attorney fees (ECF No. 24 at p.9). The Plaintiffs' failure to include a request for attorney fees appears to acknowledge that the prior request was not supported by the Contract or any law.

[4] The Court is cognizant of the fact that, generally, a judgment by default may not be entered without a hearing on damages unless the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits. *See, e.g., Dundee Cement Co. v. Howard Pipe & Concrete Prod., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). The Court concludes that no such hearing is necessary or appropriate here. Plaintiffs have asked for a specific amount in their Response. In addition, Plaintiffs have never requested a damages hearing in this matter; to the contrary, Plaintiffs have filed two separate requests for ruling on their motions for default judgment (ECF Nos. 22, 27).

1. **<u>Craftline Damages</u>**

The Court will first address categories (1), (2), and (4) above, those being expenses paid by Craftline to repair the Press, internal costs and lost labor savings incurred by Craftline due to delays, and lost lease payments from Craftline to Kappa. The Court specifically addressed these categories of claimed damages in its September 19, 2018, Opinion and Order (ECF No. 23). The Court advised Plaintiffs that, "for certain categories of damages, the Plaintiffs must explain why the actions they plead lead to the damages they request." (*Id*., p. 4). Referring specifically to these categories, the Court advised that "[t]he Plaintiffs must explicate their theory of damages detangling the lines of obligation if they want to recover these categories." (*Id*., p. 5). The direction from the Court was clear: if Plaintiffs want to collect the amounts claimed in these categories, they must provide cogent argument that explains their legal entitlement to those amounts.

In the Response, Plaintiffs address: (1) the execution of the Affidavit of Debt by a person with personal knowledge; (2) the application of Pennsylvania law; (3) whether the economic loss doctrine bars their negligence claims; and (4) their entitlement to pre-judgment interest. At no point do Plaintiffs attempt to address the specific issues related to the theories of damages noted by the Court.

Even if the Court were willing to overlook Plaintiffs' failure to comply with this Court's order, it would still conclude that Plaintiffs have failed to establish their entitlement to the identified categories of damages.[5] Take, for instance, the repair costs paid by Craftline and the lost labor savings attributable to the delay. As noted above, the Plaintiffs' right to recovery lies solely in their contractual claims. However, Craftline is not a party to the Contract. Therefore, to have

---

[5] Plaintiffs' election to fail to comply with the directions of this Court is sufficient for this Court to deny the relief requested in these categories. *See Hoskins v. Dart*, 633 F.3d 541, 543 (7th Cir. 2011) ("courts may impose appropriate sanctions, including dismissal or default, against litigants who violate . . . rules and orders designed to enable judgment to control their dockets and manage the flow of litigation.").

standing to pursue the amounts it paid, Craftline would need to establish itself as a third-party beneficiary to the Contract. This it cannot do.

Pennsylvania has adopted the Restatement (Second) of Contracts § 302 (1979) with respect to third-party beneficiaries. *Guy v. Liederbach*, 459 A.2d 744, 751 (Pa. 1983). Section 302 states:

> § 302. Intended and Incidental Beneficiaries
> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
> > (a) the performance of the promise will satisfy an obligation of the promise to pay money to the beneficiary; or
> > (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

There is thus a two part test for determining whether one is an intended third party beneficiary: (1) the recognition of the beneficiary's right must be "appropriate to effectuate the intention of the parties," and (2) the performance must "satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

There is no evidence before the Court that indicates Kappa and Defendant intended to make Craftline a beneficiary to the Contract. While Craftline is referenced in the Contract as the owner of the location where the Press was to be reassembled, there is no provision in the Contract that indicates that Craftline was a third-party beneficiary of the Contract. There are no rights that flow to Craftline, and Craftline is not entitled to any notices related to the Contract. (ECF No. 24-1, p. 8). Therefore, a review of the plain language of the Contract fails to reveal any intent on the part of Kappa and Defendant to make Craftline a third-party beneficiary under the Policy.

Moreover, the Court concludes that there would have been no reason for Defendant to believe that it owed a duty to anyone other than Kappa. The only reason Craftline was responsible

12

for the repairs to the Press was that it agreed to make them in the Agreement. The Agreement made Craftline solely responsible for "all parts, service and labor required to keep the [Press] in good mechanical condition" (ECF No. 26-4, p. 2), and further put all risk of "loss, damage . . . or destruction of the [Press]" on Craftline. (*Id*., p. 3). Unless Defendant was provided with the Agreement, it would have had no reason to believe that repairs to the Press would have been the responsibility of anyone other than its owner, Kappa. Given the fact that the Agreement was not executed until nearly six months after the Contract, it is impossible that Defendant could have been aware of the Agreement when it executed the Contract. Given the foregoing, the Court concludes that there is no basis to award Plaintiffs any amounts Craftline paid to repair the Press.

Plaintiffs' claim for lost lease payments fares no better. In a breach of contract claim, "the aggrieved party may recover all damages, provided '(1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.'" *Ely v. Susquehanna Aquacultures, Inc.*, 130 A.3d 6, 10 (Pa. Super. Ct. 2015) (quoting *Helpin v. Tr. of Univ. of Penn.*, 10 A.3d 267, 270 (Pa. 2010)). The Court concludes that nearly $1,000,000.00 in lost lease payments is not the kind of damages that "naturally and ordinarily" results from a party's failure to properly disassemble and reassemble a printing press. While a breaching party in the shoes of the Defendant could fairly expect to pay for repair or replacement of the printing press, the Court does not believe that such a party would expect to also be responsible for a seven-figure rent payment.

Nor does the Court believe that the lost rent damages were within the contemplation of the parties when the Contract was made. As noted above, the Agreement was not executed until six months after the Contract was signed. It is inconceivable, then, that Defendant would have

13

expected to be potentially responsible for damages flowing from a contract between Kappa and Craftline that was not in existence. Unless Defendant was made aware of the potential for the rental agreement, and there is no evidence that it was, there is simply no basis to hold it responsible for the lost lease payments. *See Egerer v. CSR West, LLC*, 67 P.3d 1128 (Wash. Ct. App. 2003) (contractor not responsible for two years of lost commercial rents where the contractor was not informed of any potential tenants).

The Court also questions why there are lost lease payments in the first place. The Agreement is extraordinarily one-sided in favor of Kappa.[6] There is no provision that would permit Craftline to terminate the Agreement, and none of the identified "Events of Default" apply to Kappa. As noted above, under the Agreement, the responsibility to repair and maintain the Press was on Craftline alone. Under the express terms of the Agreement, then, there is no legal basis for Craftline to have avoided any of the required lease payments to Kappa regardless of whether the Press was in working order. While Kappa is free to enforce its legal rights or not, it is not free to burden Defendant with its inaction. *See Mader v. Duquesne Light Co.*, 199 A.3d 1258, 1267 (Pa. Super. Ct. 2018) (providing that the duty to mitigate damages "prevents the injured party from being rewarded for its failure to act.").

Given the Plaintiffs' failure to "explicate their theory of damages detangling the lines of obligation" and the fact that there is no basis to support a finding that Craftline was an intended third party beneficiary of the Contract, the Court finds that the Plaintiffs are not entitled to recover

---

[6] It is not clear if the Agreement was an arms-length transaction, such that the numbers in the Agreement could ever support a claim for damages. The (most recent) Affidavit of Debt is executed by the Vice President and General Counsel of a management company that manages both Kappa and Craftline. The address on file for Kappa with the Pennsylvania Secretary of State is 40 Skippack Pike, Fort Washington, PA 19034 (https://www.corporations.pa.gov/search/corpsearch), which is the same address of Craftline's Incorporator (https://bsd.sos.in.gov/PublicBusinessSearch/BusinessInformation?businessId=1028575&businessType =Domestic%20For-Profit%20Corporation&isSeries=False). There is plainly some relationship between the Plaintiffs which is not explained in any of Plaintiffs' filings.

those amounts Plaintiffs attribute to: 1) parts and services paid by Craftline for installation costs outside of responsibility scope: **$88,216.00**; 2) internal labor/material costs Craftline incurred for the initial installation cost. Labor savings due to delays: **$49,275.00**; and 3) lease payments Kappa lost from Craftline related to damages: **$525,920.00**.

### 2. Repair Costs for Disassembly, Reinstallation and Repair

Plaintiffs next seek **$500,760.00** for repair costs Kappa will allegedly incur for the disassembly, reinstallation and repair of the Press. In support of their claim, the Plaintiffs rely upon three estimates from ManRoland. There are multiple problems with Plaintiffs' proof on these amounts. First is the Affidavit of Debt itself. This Court directed the Plaintiffs to support their damages with an affidavit "signed by an individual who has personal knowledge of those damages." (ECF No. 23, p. 4). In response to that direction, Plaintiffs submitted the affidavit of Robert Downs ("Downs"), "the Vice President & General Counsel for Spartan Organization, Inc., the management company" for Plaintiffs. (ECF No. 26). Although the affidavit states that Downs has "personal knowledge of the damages sustained" by Plaintiffs, "it is the specific facts within the affidavit, and not the boilerplate language preceding the testimony, that evidences personal knowledge." *MCI Worldcom Network Servs., Inc. v. Atlas Excavating, Inc.*, No. 02 C 4394, 2005 WL 1300766, at *5 (N.D. Ill. Feb. 23, 2005); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). The Affidavit of Debt contains no evidence demonstrating Downs' alleged personal knowledge. His title, Vice President and General Counsel of Spartan Organization, Inc. ("Spartan"), does nothing to demonstrate his personal knowledge of Plaintiffs' damages. Spartan is not one of the Plaintiffs, and there is no indication from the Affidavit of Debt or the exhibits that demonstrates that any of the damages were computed by or even submitted to

Spartan. Moreover, neither Downs nor Spartan appear on any of the exhibits. Plaintiffs, then, have submitted no evidence demonstrating Downs' personal knowledge, rendering the Affidavit of Debt inadmissible.

Even if the Affidavit of Debt was admissible, the ManRoland exhibits (ECF No. 26-3) would not be. To be admissible in federal court, evidence must be authenticated. Fed. R. Evid. 901(a) requires, as a condition precedent to admission, that a piece of evidence be authenticated through "evidence sufficient to support a finding that the matter in question is what its proponent claims." While documents can be authenticated by attaching them to an affidavit of an individual who swears that the documents are true and correct copies of the originals, the individual who authenticates the documents must have personal knowledge of their authenticity. Fed. R. Evid. 901(b)(1); *see also Szymankiewicz v. Doying*, 187 F. App'x. 618, 622 (7th Cir. 2006) (prison documents attached to affidavit not admissible where they were not accompanied by authentication by records custodian). As noted above, there is no evidence presented in the Affidavit of Debt demonstrating that Downs has personal knowledge of any of the information presented therein, and this would include the ManRoland exhibits.

In addition to failing to submit any admissible evidence regarding the cost of any repairs, the Plaintiffs have failed to provide any evidence regarding the need to disassemble, reassemble and reinstall the Press. In order to determine if the costs associated with such work naturally flows from the breach of contract, it is necessary for the Plaintiffs to provide the Court with admissible evidence regarding the need to disassemble, reassemble and reinstall the Press.

The Plaintiffs have failed to submit any evidence rendering the repair amounts admissible, and the Court cannot grant any relief based on those amounts. The Court grants Plaintiffs 10 days from the date of this Order to submit admissible evidence to support the repair costs Kappa will

16

incur related to the disassembly, reinstallation, and repair of the Press and evidence establishing the need for such work. The Court hereby admonishes the Plaintiffs that they have been provided with multiple opportunities to submit admissible evidence to support their request for default judgment. This will be the final opportunity entertained by the Court. The Court will make its determination based upon the evidence submitted in response to this Opinion and Order.

### 3. Prejudgment Interest

Turning to Plaintiffs' claim for prejudgment interest in the amount of **$62,960.73**, Pennsylvania law provides that "prejudgment interest is a matter of right [in breach of contract matters] where the amount is ascertainable from the contract. Where the amount due and owing is not sufficiently definite, prejudgment interest is awardable at the discretion of the trial court." *Century Indem. Co. v. OneBeacon Ins. Co.*, 173 A.3d 784, 810 (Pa. Super. Ct. 2017). Here, none of the damages requested by Plaintiffs are ascertainable from the Contract; the Contract provides only that Kappa shall have "all rights available to it under law or equity" in the event of default. (ECF No. 24-1, p. 3). Accordingly, Plaintiffs are not entitled to prejudgment interest as a matter of right, and the Court declines to exercise its discretion to award it.

## CONCLUSION

Given the foregoing, the Court finds that the Plaintiffs are not entitled to an award of damages related to parts and service paid by Craftline; internal labor/material costs incurred by Craftline or related to lost labor savings; lost lease payments form Craftline; or prejudgment interest. The Court further finds that the Plaintiffs have failed to provide any admissible evidence or argument supporting their claims for such damages.

The Court hereby grants the Plaintiffs 10 days from the date of this Order to submit admissible evidence relative to its claim for damages related to Kappa's repair costs arising from

the breach and admissible evidence establishing the need to disassemble, reassemble and reinstall the Press.

In the event Plaintiffs fail to submit admissible evidence within 10 days to support their claim for Kappa's repair cost, this does not mean that Plaintiffs are entitled to nothing. If a plaintiff is able to prove a breach of contract but can show no damages flowing from the breach, the plaintiff is entitled to recover nominal damages. *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984). Accordingly, in the event Plaintiffs do not submit admissible evidence to support their remaining claim for damages, the Court will find that Plaintiffs are entitled to nominal damages and will enter a default judgment in favor of the Plaintiffs accordingly.

SO ORDERED on May 16, 2019.

                                                s/ Holly A. Brady
                                                JUDGE HOLLY A. BRADY
                                                UNITED STATES DISTRICT COURT